# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STUDIOS OF SELF DEFENSE, INC.,<br><br>      Plaintiff,<br><br>  vs.<br><br>KRISTOPHER RINEHART ET AL.,<br><br>      Defendant. | CASE NO. SA CV 18-1048-DOC (DFMx)<br><br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER GRANTING IN PART MOTION FOR TERMINATING SANCTIONS [221]** |

# I.   **INTRODUCTION**

A bench trial on this matter was held on October 29–31, 2019.

This action arises out of a dispute between United Studios of Self Defense ("USSD" or "Plaintiff") over alleged franchise and license agreements with Kristopher Rinehart ("Rinehart"), Brent Murakami ("Murakami") and entities owned wholly or partly by Rinehart and Murakami including Los Angeles Studios of Self Defense ("LASSD"), South Bay Studios of Self Defense ("SBSSD"), S.B. Ninja, LLC ("S.B. Ninja"), and Rolling Hills USSD ("RHSSD") (collectively, "Defendants").

Plaintiff alleges the following eight claims:

1. Breach of Contract as to the Redondo Beach Franchise Agreement
2. Breach of Contract as to the Beverly Hills Franchise Agreement
3. Declaratory relief as to the Redondo Beach Franchise Agreement
4. Intentional interference with contract against Murakami and S.B. Ninja
5. False designation/unfair competition under the Lanham Act
6. Unfair business practices under Cal. Bus. & Prof. Code §§ 17200 et. seq. ("UCL")
7. Accounting of profits made from Lanham Act violation
8. Declaratory relief as to rights and obligations under the Redondo Beach and Beverly Hills Franchise Agreements

Defendants allege the following three counterclaims:

1. Declaratory relief as to lack of formation of the Redondo Beach Franchise Agreement
2. Declaratory relief as to right to rescind Rolling Hills License Agreement
3. Breach of contract as to Beverly Hills Franchise Agreement

Defendants also request the Court allow them to amend their counterclaims to include the following three counterclaims they allege have been proven at trial:

4. Declaratory relief as to illegality of Redondo Beach License Agreement

5. Breach of contract as to Torrance and Rolling Hills License Agreements

6. Declaratory relief as to illegality of Beverly Hills Franchise Agreement

During trial, Defendants also requested terminating sanctions for alleged bad faith behavior of Charles Mattera. *See* Motion for Terminating Sanctions ("Motion"). Dkt. 221.

The Court issues the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. To the extent that any findings of fact are included in the conclusions of law section, they shall be deemed findings of fact, and to the extent that any conclusions of law are included in the findings of fact section, they shall be deemed conclusions of law. The Court incorporates its findings to **GRANT IN PART** Defendants' Motion, as explained below.

## II.    FINDINGS OF FACT

### A. Background

1. Plaintiff USSD is a corporation duly organized under the state of California, with its principal place of business in Irvine, California. USSD's owner and CEO is Charles Mattera ("Mattera").

2. Defendants are Rinehart, an individual; Murakami, an individual; SBSSD, a California limited liability company; LASSD, a California limited liability company; S.B. Ninja, a California limited liability company; and Counterclaimant RHSSD, a California limited liability company.

3. SBSSD and Archie Currin are members of LASSD. S.B. Ninja and Rinehart are members of SBSSD. Murakami is the sole member of S.B. Ninja. S.B. Ninja and Tomas Orzco are members of RHSSD.

4. At trial there was a factual dispute as to whether Murakami was a member of SBSSD individually, or whether S.B. Ninja was a member of SBSSD. The evidence at trial

3

was that SBSSD had an operating agreement dated July 1, 2011 listing Murakami as the member of SBSSD rather than S.B. Ninja. [Ex. 652]. Murakami testified at trial that there was another operating agreement dated August 5, 2011 [Ex. 653] for SBSSD postdating the July 1, 2011 SBSSD operating agreement [Ex. 652]. The August 5 agreement changed the membership in SBSSD from Murakami to S.B. Ninja. [10/30/2019 Trans. Vol. III at 86:3–89:14], [10/31/2019 Trans. Vol. III at 15:24–16:11]. The Court acknowledges that the information on file with the California Secretary of State contradicts Murakami's testimony of the purported August 5, 2011 operating agreement because it reflects Murakami being a member of SBSSD individually. [10/30/2019 Trans. Vol. II at 76:5–8]. However, the Court finds Mr. Murakami's testimony and Exhibit 653 credible and determines that S.B. Ninja is a member of SBSSD along with Rinehart.

**B. Charles Mattera**

5. Charles Mattera has no credibility with this Court.

6. The Court finds Mattera lied under oath in his responses to interrogatories wherein he claimed not to know about a critical witness, namely, Alejandro Corrales. [Exs. 508-509]. It was subsequently learned that Mattera knew exactly who Alejandro Corrales was because Mattera later admitted Alejandro Corrales is an alias of Luis Auza. [10/29/2019 Trans. Vol. III at 63:1–64:5], [10/29/2019 Trans. Vol. IV at 46:20–49:4]. Mattera's explanation, namely that he "forgot," is not credible.

7. Mattera was not forthright in a May 19, 2019 declaration to this Court when he said that he thought that all the information provided to him by Luis Auza regarding the "Jessica Allegations" up through Auza's February 6, 2019 deposition was genuine. [Ex. 503 at 12]. Mattera later admitted he "stopped believing in Luis at the end of the year [2018] and into January [2019]." [10/29/2019 Trans. Vol. III at 79:24–80:9].

8. The Court finds that Mattera knowingly lied on the stand when he testified that he

4

did not state that his attorneys were going to bury evidence in this case. [10/29/2019 Trans. Vol. IV at 86:1–24], [10/29/2019 Trans. Vol. V at 39:21–23].

9. Exhibit 561 shows Mattera speaking to Auza about how the "Jessica Allegations" can be used to leverage a settlement in this case because Rinehart would not want to lose his license to practice medicine.

10. Exhibit 566 shows Mattera discussing how he wants to go "all-in" on the allegations to "destroy" Rinehart.

11. Exhibit 573 shows Mattera discussing with Auza how Auza should testify at his deposition including implying Auza should perjure himself.

12. Exhibit 575 shows Mattera discussing with Auza how Auza should testify at his deposition including implying Auza should perjure himself.

13. The Court finds that the Plaintiff through Mattera suborned perjury of Luis Auza and witness tampered with Luis Auza prior to Luis Auza's February 6, 2019 deposition. [*See* Exs. 561, 566, 573, 575]. The audio recordings capturing the conversations between Mr. Auza and Mattera referenced above confirm such.

14. The Court cannot make a finding that Mattera knew that the "Jessica Allegations" were false with certainty before the February 2019 deposition of Luis Auza. However, the Court finds that Mattera's actions in the months leading to the February 2019 deposition show, at minimum, a reckless disregard for the truth of the allegations given their extremely serious nature and given that Mattera was actively using the allegations as leverage to get Rinehart to settle the action.

15. The Court also finds that Mattera acted in reckless disregard to Rinehart's livelihood, family life, and personal and professional reputation.

16. Finally, the Court makes no adverse findings on the actions of Plaintiff's counsel.

17. Given the above actions, the Court will make all relevant factual findings requiring a credibility determination of Mattera against the Plaintiff.

## C. USSD's Business

18.     USSD is a franchisor of martial arts franchised studios. [10/29/2019 Trans. Vol. II at 8:22–24]. Its franchisees provide martial arts training and instruction in USSD's system of "Shaolin Kempo Karate." [10/29/2019 Trans. Vol. II at 9:1–4]. The franchisees also sell retail martial arts supplies approved by USSD at their USSD's franchised studios. [10/29/2019 Trans. Vol. II at 9:5–7]. The services and goods provided by USSD's franchisees are associated with USSD's brand name, service marks, and registered trademarks (the "USSD Marks") and its system of Shaolin Kempo Karate. [Ex. 52].

19.     USSD has the following trademarks on the principal register with the United States Patent and Trademark Office in which the USSD brand name and the USSD Logo have been registered as both trademarks and service marks:

Registration No. 4232409, USSD, October 30, 2012;

Registration No. 3470475, USSD, July 22, 2008;

Registration No. 1758349, USSD, March 16, 1993; and

Registration No. 175295, USSD, February 16, 1992. [Ex. 52].

These registrations are part of the USSD Marks and are used by USSD and USSD's franchisees and USSD's trademark licensees in connection with the sale of martial arts goods and services.

20.     USSD was registered to offer and sell franchise offerings in California with the Department of Corporations between approximately 1993 and 1998. [10/29/2019 Trans. Vol. II at 26:20–27:20]. USSD sold franchises in California during this time. [10/29/2019 Trans. Vol. II at 27:21–23]. USSD did not re-register to sell franchises in California thereafter until 2012. [10/29/2019 Trans. Vol. II at 39:12–17].

21. USSD and Mattera are subject to a 1996 permanent injunction by the state of California, which states the following, in relevant part:

"IT IS THEREFORE ORDERED as follows: THE UNITED

STUDIOS OF SELF DEFENSE, INC. and CHARLES A. MATTERA
and their directors, successors in interest, controlling persons,
agents, employees, attorneys in fact, and all other persons acting in
concert or participating with them, or any of them, are permanently
enjoined from directly or indirectly:

     1.    Offering to sell, selling, arranging for the sale,
issuing, engaging in the business of selling, negotiating for the sale
of, or otherwise in any way dealing or participating in the offer or
sale of any franchise whether as part of the scheme complained of
in the complaint or otherwise, which is not exempt from the
registration requirements under the California Franchise Investment
Law, unless and until they shall have first applied for and secured
from the Commissioner, a registration pursuant to California
Corporations Code Section 11111 authorizing the offer and sale of
such franchises.

     2.    Filing with the Commissioner any application, notice
or report which contain an untrue statement of a material fact or
omitting to state in such application, notice or report any material
fact which is required to be stated therein, including, but not limited
to the applications complained of in the complaint…" [Exs. 525,
526]

22. USSD re-registered to offer and sell franchises in the State of California in 2012, and
USSD renewed its registrations each year thereafter until 2017. [10/29/2019 Trans.
Vol. II at 39:12–40:20]. USSD was registered with the State of California to offer and
sell franchises at all times between 2012 and 2017. *Id.*

## D. Alleged Franchisees and Licensees

### The Torrance and Rolling Hills License Agreement

23. On May 28, 2009, Max J., Inc., entered into a trademark license agreement with USSD (the "Torrance License Agreement"). [Ex. 633]. The Torrance License Agreement had a 20-year term. [Ex. 633 at 5, § 12; 10/29/2019 Trans. Vol. III at 54:6–15; 56:11–15].

24. Max J., Inc. thereafter transferred the Torrance License Agreement to S.B. Ninja, and USSD consented to the transfer on October 1, 2009. [Ex. 634].

25. Murakami, without any formal written agreement, operated the RHSSD location with express permission from USSD from 2016 until March of 2018. [10/30/2019 Trans. Vol. I at 56:22–58:16]. In March of 2018, the relationship as to the operation of the RHSSD location was formalized via the "Torrance and Rolling Hills License Agreement." [Ex. 38].

26. The Torrance License Agreement was amended by the March 2018 Torrance and Rolling Hills License Agreement. [Ex. 38]. On March 19, 2018, Murakami signed the Torrance and Rolling Hills License Agreement on behalf of S.B. Ninja as it relates to Torrance, and on behalf of RHSSD as it relates to Rolling Hills. Therefore, S.B. Ninja is the licensee for the operation of a Torrance USSD location and RHSSSD is the licensee for a USSD location in Rolling Hills. Mattera signed the agreement on behalf of the licensor, USSD. The governing agreement for the Torrance and Rolling Hills locations is the Torrance and Rolling Hills License Agreement. [Ex. 38].

27. Exhibit 38 has a three-year term set to expire on March 19, 2021.

28. The agreement requires Murakami to administer all brown and black belt testing at USSD headquarters and share the revenue with USSD. [Ex. 38].

29. On September 7, 2018, Murakami appeared on behalf of LASSD at the USSD headquarters and was advised by counsel for USSD that Murakami was required to leave USSD premises due to the pending litigation or be charged with trespassing. [Ex. 580], [10/31/2019 Trans. Vol. II at 39:11–40:05].

30. The Court finds that asking Murakami to leave USSD premises due to pending litigation may have seemed reasonable given the circumstances. However, given that the underlying agreement required Murakami to conduct all testing for brown and black belts at headquarters, refusing Murakami access to headquarters may have breached the agreement.

31. USSD was not authorized to sell franchises in 2018. [10/29/2019 Trans. Vol. II at 39:12–40:20].

32. The Torrance and Rolling Hills License Agreement is a *de facto* franchise. On its face it (1) allows Murakami to use the USSD trademark; (2) requires Murakami to administer brown and black belt testing at USSD headquarters and share the revenue of those tests; and (3) requires a fee of $750 per month. [Ex. 38].

33. Furthermore, there are external indicators that a common marketing plan or system was required for the Torrance and Rolling Hills License Agreement. USSD communicated to S.B. Ninja that it must use a standardized pricing scheme. [Ex. 552-12]. Mattera testified that the standardized pricing scheme was provided to those in attendance at a First Friday meeting and that both licensees and franchisees attend First Friday meetings. Mattera testified that there was no effort to advise those in attendance that the standardized pricing scheme was required only of the franchisees in attendance and not the licensees in attendance. [10/30/2019 Trans. Vol. I at 48:21–51:24]. Mattera's testimony that the pricing was not a "requirement" is not credible. This is indicative of a franchise.

**The Redondo Beach License Agreement**

34. In March 2011, Murakami executed a trademark license agreement with USSD on behalf of S.B. Ninja (the "Redondo Beach License Agreement"). [Ex. 37].

35. The Redondo Beach License Agreement provided S.B. Ninja with the right to open and operate up to two USSD-licensed martial arts schools in the areas of Redondo Beach, Manhattan Beach, and Hermosa Beach, with all schools being opened within 18

months of April 16, 2011. [Ex. 37 at 1, 10].

36. Pursuant to the Redondo Beach License Agreement, in or around August 2011, a USSD-licensed studio began operating at 1728 Aviation Blvd., Redondo Beach, California (the "Redondo Beach Studio"). [10/30/2019 Trans. Vol. II at 84:23–85:11].

37. The evidence demonstrated that S.B. Ninja did not operate the Redondo Beach Studio alone. [10/30/2019 Trans. Vol. II at 84:5–7]. Instead, the Redondo Beach Studio at all times was operated jointly by S.B. Ninja and SBSSD. *Id*. However, SBSSD managed the day-to-day operations of the studio. [10/30/2019 Trans. Vol. II at 84:12–15]. [Ex. 40]. Nevertheless, there was not a transfer (explicit or *de facto*) of the Redondo Beach License Agreement from S.B. Ninja to SBSSD.

38. The Redondo Beach License Agreement requires the following:

    a. The Redondo Beach License Agreement required S.B. Ninja to provide its students with an extensive student manual outlining techniques and cultural aspects of the USSD system. [Ex. 37 at 4]. The student manual provision constitutes a requirement placed upon S.B. Ninja as to how it was to operate its martial arts studio which is indicative of a franchise. *Id*.; *see also* Ex. 553.

    b. The Redondo Beach License Agreement required S.B. Ninja to use its best efforts to buy martial arts equipment from a single vendor– Bushido. [Ex. 37 at 4]. This requirement substantially hampered S.B. Ninja's ability to operate its martial arts studio utilizing its own independent business judgment. This is indicative of a franchise.

    c. USSD communicated to S.B. Ninja that it must use a standardized pricing scheme. [Ex. 552-12]. Mattera testified that the standardized pricing scheme was provided to those in attendance at a First Friday meeting and that both licensees and franchisees attend First Friday meetings. Mattera testified that there was no effort to advise those in

attendance that the standardized pricing scheme was required only of the franchisees in attendance and not the licensees in attendance. [10/30/2019 Trans. Vol. I at 48:21–51:24]. Mattera's testimony that the pricing was not a "requirement" is not credible. This is indicative of a franchise.

**The so-called Redondo Beach Franchise Agreement**

39. USSD re-registered to offer and sell franchises in the State of California in 2012, and USSD renewed its registrations each year thereafter until 2017. [10/29/2019 Trans. Vol. II at 39:12–40:20]. USSD was registered with the State of California to offer and sell franchises at all times between 2012 and 2017. *Id.*

40. Ex. 533 is an unexecuted franchise agreement. There are no signatures on page 23 of the agreement. [Ex. 533-29].

41. Plaintiff seeks to pass off the last page of Ex. 1 as evidence of the supposed execution of the so-called Redondo Beach franchise agreement. [Ex. 1-30, Ex. 501].[1] The last page of Ex. 1 is an "Addendum." *Id.* Of note, the Addendum makes no reference to the document it is related to, it is not dated, and the purported franchisee is not anywhere identified on the Addendum. *Id.*

42. Rinehart signed the Addendum in response to Mattera's insistence that he needed the Addendum signed for "compliance." However, Mattera later sought to use the Addendum as evidence of the actual execution of a franchise agreement, in direct contradiction of the presentation he previously made to Rinehart. [10/31/2019 Trans. Vol. III at 26:04–21]. Mattera's testimony to the contrary is not credible.

43. Mattera made the exact representation that he made to Rinehart to another licensee, Jeff Handley. Mattera urged Mr. Handley to sign an Addendum, claiming he needed it for compliance. Mattera then later sought to use the signed Addendum by Mr. Handley as

---

[1] Exhibit 501 is the same document as the last page of Exhibit 1. Exhibit 533 together with Exhibit 501 as a last page equate to Exhibit 1.

evidence that Mr. Handley entered into a franchise agreement. This establishes a pattern and further bolsters Rinehart's testimony. [10/31/2019 Trans. Vol. I at 24:04–25:23].

44. Furthermore, the parties to the Redondo Beach License Agreement are S.B. Ninja, LLC and USSD. [Ex. 37]. There is no evidence that S.B. Ninja ever consented to its license rights under the Redondo Beach License Agreement being superseded and replaced by the so-called Redondo Beach Franchise Agreement. [Ex. 37, 501].

45. The so-called Redondo Beach Franchise Agreement purports to grant to SBSSD exclusive rights to open franchises within the territory which is defined as a two and one half (2.5) air miles of the franchise location located at 1728 Aviation Blvd., Redondo Beach, CA 90278. [Ex. 1 at § 3.8].

46. The same territory that the so-called Redondo Beach Franchise Agreement purports to grant to SBSSD had previously been granted to S.B. Ninja, LLC pursuant to the 2011 license agreement between S.B. Ninja and USSD. [Ex. 37 at § 3]. USSD cannot grant exclusive rights to the same territory to two different entities at the same time.

47. The so-called Redondo Beach Franchise Agreement fails to convey any consideration to SBSSD because the exclusive territory that is central to the alleged franchise agreement being granted to SBSSD had already been granted to S.B. Ninja, LLC pursuant to the 2011 license agreement. [Ex. 37, § 3].

48. The Court also finds that evidence that Rinehart referred to himself as a franchisee (or the Redondo Beach studio as a franchise) does not alter the above analysis.

49. For the above reasons, the Court finds that there is no valid Redondo Beach Franchise Agreement.

**The Beverly Hills Franchise Agreement**

50. On July 16, 2015, Rinehart executed a franchise agreement with USSD on behalf of LASSD (the "Beverly Hills Franchise Agreement") to operate a USSD licensed studio located at 250 South Robertson, Beverly Hills, California (the "Beverly Hills Studio").

[Ex. 3].[2]

51. The Beverly Hills Franchise Agreement names SBSSD as a party, but the signature page of the agreement shows LASSD is the operative franchisee. [Ex. 3 at 7, 39]. There is no dispute between the parties that the actual franchisee is LASSD. In fact, the Plaintiff pled as much. [Ex. 599 ¶ 22].

52. Rinehart executed the franchise agreement on behalf of LASSD and not on behalf of himself personally, just as Mattera signed the agreement on behalf of USSD and not on behalf of himself personally. [Ex. 3 at 29].

53. As part of the Beverly Hills Franchise Agreement, Rinehart signed an Addendum on July 15, 2015 which purported to change the terms of the franchise by replacing the $75,000 franchise fee with a dollar. [Ex. 3 at 30].

54. The Beverly Hills Franchise Agreement was also altered via a Promissory Note between LASSD and Pirooz Nourizad dates July 16, 2015. [Ex. 530]. The consideration paid by LASSD for the Beverly Hills franchise is not the $75,000 franchise payment that was a part of the then-registered franchise, but rather, the consideration outlined in the Promissory Note. *Id.*

55. These are material negotiated changes to the Beverly Hills Franchise Agreement from the franchise agreement that was then-registered with the California Department of Business Oversight ("CA DBO").

56. The franchise agreement registered with the CA DBO as of July 2015 included a franchise payment of $75,000. [Ex. 645 at 312].

57. The Court makes no factual finding as to whether the Beverly Hills Franchise Agreement was a transfer or a new franchise agreement, as it is not consequential to its legal determinations.

---

[2] Exhibit 3 and Exhibit 639 are almost the same document. Exhibit 3 contains a "receipt" as a last page that Exhibit 639 does not have.

**Alleged Breaches of Franchise Agreements**

*Tournaments*

58. In 2017, Rinehart and Murakami announced to Mattera that they intended to host their own independent tournament without USSD's approval. [10/29/2019 Trans. Vol. III at 40:6–41:1]. Though Rinehart pitched the tournament to Mattera in July 2017, Mattera informed Rinehart that USSD would not endorse or approve of the independent tournament. [Ex. 7].

59. Rinehart and Murakami pressed forward with their independent tournament preparation over USSD's objection. [10/29/2019 Trans. Vol. III at 41:2–15]. Approximately two days prior to the tournament, Mattera informed other USSD franchisees that USSD was not going to act to prevent the September 2017 independent tournament from proceeding forward. *Id*.

60. Section 6.2.7 of the Franchise Agreements requires SBSSD and LASSD to recommend to all of their students that they participate in USSD's tournaments, competitions, and demonstrations. [Ex. 1 at 13; Ex. 3 at 13].

61. Section 3.10 of the Franchise Agreements states USSD "reserves all rights not specifically granted to the franchisee." Plaintiff takes this to mean that (1) the right to conduct inter-studio tournaments and (2) the right to host "open" tournaments where non-USSD martial artists are able to compete are not granted as a right to SBSSD or LASSD under the Franchise Agreements.

62. The Court finds that sponsoring, endorsing, or hosting martial arts tournaments is included as part of the operations of a martial arts studio.

63. The Court rejects Plaintiff's argument that Section 3.10 can be read to suggest that Plaintiff reserves the right to prohibit franchisees from hosting or sponsoring martial arts tournaments because the right to do so is not specifically granted. Instead, section 3.10 speaks to intellectual property rights and not to activity that is or is not restricted.

64. In order to restrict franchisees from hosting or sponsoring martial arts tournaments, and

because martial arts tournaments as noted above are a service that is part of the operation of a martial arts studio, it would have been in incumbent on Plaintiff as the drafter of the franchise agreement to clearly articulate such a restriction.

65. The Court finds that there is nothing in the franchise agreements that prohibits franchisees from hosting or sponsoring tournaments.

***Bushido Goods***

66. Section 6.2.14 of the Franchise Agreements lists the designated vendor from which SBSSD and LASSD are required to purchase martial arts supplies. [Ex. 1 at 14; Ex. 3 at 14]. This vendor is designated as Bushido. *Id.*

67. The Franchise Agreements also provide a mechanism for SBSSD and LASSD to request in writing for USSD to approve a supplier other than Bushido within Sections 6.2.14.1 through 6.2.14.5. *Id*. Section 6.2.14.5 of the Franchise Agreements provides that USSD's approval of any non-Bushido martial arts supplier must first be approved in writing by USSD. *Id.*

68. The Court finds that Bushido frequently ran out of inventory of needed equipment and also did not offer equipment of the quality needed by the franchisees. [10/30/2019 Trans. Vol. III at 120:23–121:24], [10/31/2019 Trans. Vol. II at 27:06–19].

69. Further, the Court finds that there was no financial damage done to USSD even if there was any alleged breach of this provision of the franchise agreements. First, Mattera admitted that the failure to purchase goods from Bushido does not cause any financial harm to USSD. [10/30/2019 Trans. Vol. I at 17:14–21]. Though Mattera claims that there is a damage to brand reputation because Bushido "provides all of our brand logo goods. And the quality of Bushido has to be excellent," his testimony is not credible. [10/30/2019 Trans. Vol. I at 17:10–12]. In fact, Mattera admitted that not all Bushido goods are branded with the USSD logo. [10/30/2019 Trans. Vol. I at 23:16–24:8]. And the Court has already found that Bushido frequently ran out of inventory and the goods were not of good quality. The Court finds that there is no damage even if any alleged

15

breach of this provision did occur.

**Belt Testing**

70. Section 6.2.8 of the Franchise Agreements provides:

> Franchisee agrees that Franchisor will test for brown and black belt degrees at Franchisor's headquarters, or at any other location selected Franchisor. [*sic*] Franchisor shall receive one hundred percent (100%) of all testing fees for the brown and black belt degrees. [Ex. 1 at 13; Ex. 3 at 13].

71. Section 6.2.4 of the Franchise Agreements require SBSSD and LASSD to only offer products and services that have been approved by USSD. *Id*. Section 6.2.4 also requires SBSSD and LASSD to "discontinue selling and offering for sale any services or products as Franchisor may, in its discretion, disapprove in writing at any time." *Id*.

72. Notably, neither section explicitly prohibits a franchisee from testing for brown and black belt degrees. Instead, a strict reading of Section 6.2.8 requires (1) Franchisees to allow *Franchisor* to test at Headquarters (or any other location selected by the Franchisor) and (2) Franchisor receive 100% of all testing fees. The agreements do not explicitly prohibit *Franchisees* from testing, even if such a prohibition may arguably be inferred from the language.

73. The Court finds that brown and black belt testing is a service that is a part of operating a martial arts studio. Even Mattera testified that black and brown belt testing are an inherent service of a martial arts studio. [10/29/2019 Trans. Vol. II at 23:08–13].

74. Given that testing is an inherent part of operating a studio, the Court finds that ambiguous language in Section 6.2.8 and Section 6.2.4 does not explicitly prohibit a franchisee from offering a student of its martial arts studio a brown or black belt test. The Court rejects Plaintiff's argument that these clauses (or the residual Section 3.10 clause) must be interpreted as reflecting a prohibition of brown and black belt testing

by a franchisee.

75. Further, the Court finds that if Plaintiff intended to preclude black and brown belt testing in such a manner, as the drafter of the franchise agreement Plaintiff should have more clearly set forth such prohibition in the franchise disclosure document ("FDD") and in the operative franchise agreement.

***Payment via ACH***

76. Section 4.2 of the Franchise Agreements requires SBSSD and LASSD to make a monthly payment of $750 to USSD, and 4.5.1 provides that this must be via an automated clearing house ("ACH") system if USSD so specifies. [Ex. 1 at 9–10; Ex. 3 at 9–10].

77. The Court finds that there was no evidence that ongoing monthly dues payments were not made. In fact, LASSD and SBSSD have paid via check instead of payment via ACH. [10/29/2019 Trans. Vol. III at 43:12–25].

78. Payments made via checks and not through ACH did not cause any damage. Further, the Court finds that the momentary lapse of dues payments by Defendants is immaterial and did not cause any damage because the payments were made. The additional time and administrative expenses complained of by Mattera are insignificant, and in any event, Mattera is not credible. [10/29/2019 Trans. Vol. III at 44:6–9]. The Court finds that there is no damage even if any alleged breach of this provision did occur.

***Zen Billing Company***

79. Section 6.2.13 of the Franchise Agreements provides that SBSSD and LASSD are required to use a billing company that USSD may designate from time to time for all students' billing contracts. [Ex. 1 at 14; Ex. 3 at 14].

80. The evidence at trial was that USSD's current designated billing company is Zen Billing, Inc. ("Zen Billing"). [10/29/2019 Trans. Vol. III at 44:18–22].

81. SBSSD and LASSD stopped using USSD's designated billing company in 2018. [10/29/2019 Trans. Vol. III at 44:10–22]. However, there was no evidence produced at

trial that Plaintiff ever informed Defendants of the new designated billing company. Furthermore, the old billing company that Defendants stopped using in 2018 improperly aggregated the funds of franchised studios into a single account. *See* Dkt. 165. Finally, there was no evidence produced at trial that failure to use this billing company resulted in any damages to the Plaintiff.

## III.    CONCLUSIONS OF LAW

82. This Court has original subject matter jurisdiction over this case pursuant to §§ 32 and 43 of the Lanham Act, 15 U.S.C. § 1125(a) pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1338(a). This Court has supplemental jurisdiction over the related state claims pursuant to 28 U.S.C. § 1338(b) and 28 U.S.C. § 1367.

83. Venue is proper because the franchise agreements at issue require disputes pertaining thereto to be litigated in Orange County, California in a court of competent jurisdiction.

### A. Plaintiff's Claims

#### 1. Breach of Contract as to the Redondo Beach Franchise Agreement

84. To establish a valid contract there should be (1) parties capable of contracting; (2) consent; (3) a lawful object; and (4) a sufficient cause or consideration. Cal. Civ. Code § 1550.

85. To establish a breach of contract, the Plaintiff must show: (1) Plaintiff and Defendants entered into a valid, binding contract; (2) Plaintiff performed all obligations under the contract, except those excused; (3) that conditions required by the contract for Defendants' performance had occurred or were excused; (4) that Defendants breached the terms of the contract; (5) Plaintiff was harmed; (6) Defendant's breach of contract was a substantial factor in causing the harm; (7) the parties were capable of contracting; (8) the parties consented to the terms of the contract; (9) the contract has a lawful purpose; and (10) there was sufficient consideration. Cal. Civ. Code § 1550 *et. seq.*

1   86. Under California Law, "when it is clear that both parties contemplate that acceptance of

2   a contract's terms would be signified in writing, the failure to sign the agreement

3   means that no binding contract is created." *Goodworth Holdings Inc. v. Suh*, 239 F.

4   Supp. 2d 947, 958 (N.D. Cal. 2002), aff'd, 99 F. App'x 806 (9th Cir. 2004).

5   87. The Court finds there is no valid Redondo Beach Franchise Agreement because (1)

6   there is no consent to enter a franchise agreement as Rinehart never signed the

7   franchise agreement; (2) even if Rinehart had signed the agreement, there is no

8   evidence that S.B. Ninja, which held the Redondo Beach License Agreement, ever

9   agreed to curtail its rights under a franchise agreement; and (3) the alleged agreement

10  fails for lack of consideration.

11  88. There is no consent to enter a franchise agreement because Rinehart signed an

12  Addendum that makes no reference to the document it is related to, it is not dated, and

13  the purported franchisee is not anywhere identified on the Addendum. [Ex. 501].

14  89. There is also no consent because S.B. Ninja, which held rights under the Redondo

15  Beach License Agreement, never consented to a franchise agreement.

16  90. Even if there was consent, the agreement fails for lack of consideration because the

17  same territory that the so-called Redondo Beach Franchise Agreement purports to grant

18  to SBSSD had previously been granted to S.B. Ninja pursuant to the 2011 license

19  agreement between S.B. Ninja and USSD. [Ex. 37 at § 3]. USSD cannot grant

20  exclusive rights to the same territory to two different entities at the same time.

21  91. Plaintiff has not shown that there is a breach of contract. Instead, no valid contract was

22  formed. *See* Cal. Civ. Code § 1550 (requiring consent and consideration for a valid

23  contract).

24  **2.  Breach of Contract as to the Beverly Hills Franchise Agreement**

25  92. Plaintiff argues that Defendants LASSD and Rinehart breached the Beverly Hills

26  Franchise Agreement by (1) selling brown and black belts; (2) buying non-Bushido

27

28

products; (3) planning to host independent tournaments; (4) paying fees outside of the ACH system; and (5) failing to use Zen Billing.

93. The Court finds that Defendants did not breach the Beverly Hills Franchise Agreement by selling brown and black belts at the location because the agreement does not explicitly prohibit such testing. *See* ¶¶ 70–75.

94. The Court finds that Defendants did not breach the Beverly Hills Franchise Agreement by buying non-Bushido goods because there is no proof of any damages as it relates to purchasing non-Bushido goods. *See* ¶¶ 66–69. If Plaintiff is not damaged, then there is no breach. *See* Cal. Civ. Code § 1550 (requiring damages to prove breach of contract). Furthermore, Bushido frequently ran out of inventory and did not offer equipment of the quality needed by the franchisees.

95. The Court finds that Defendants did not breach the Beverly Hills Franchise Agreement by planning to host independent tournaments because there is nothing in the franchise agreements that prohibits franchisees from hosting or sponsoring tournaments. *See* ¶¶ 58–65.

96. The Court finds that Defendants did not breach the Beverly Hills Franchise Agreement by paying fees outside of the ACH system because there is no proof of any damages as it relates to monthly dues payments paid via check and not through ACH. *See* ¶¶ 76–78. If Plaintiff is not damaged, then there is no breach. *See* Cal. Civ. Code § 1550 (requiring damages to prove breach of contract).

97. The Court finds that Defendants did not breach the Beverly Hills Franchise Agreement by failing to use Zen Billing. Though the agreement required payment through a billing company designated by Plaintiff, Plaintiff did not prove that Plaintiff ever informed Defendants of the new designated billing company. Further, Plaintiff did not show any damages associated with the failure to use the billing system. *See* ¶¶ 79–81. Finally, the old billing company that Defendants stopped using in 2018 improperly aggregated the funds of franchised studios into a single account. *See* Dkt. 165.

98. Accordingly, Plaintiff has not shown that the Beverly Hills Franchise Agreement was breached.

### 3. Declaratory relief as to the Redondo Beach Franchise Agreement

99. The Court has found that the Redondo Beach Franchise Agreement is invalid. Therefore, the Court does not grant declaratory relief and does not find that the Redondo Beach License Agreement was superseded by the so-called Redondo Beach Franchise Agreement.

### 4. Intentional interference with contract against Murakami and S.B. Ninja

100. To show intentional interference with contractual relations, USSD must show: (1) A valid contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. *Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1126 (1990) (internal citations omitted).

101. Plaintiff limits its claim for intentional interference with contract to the Redondo Beach Franchise Agreement and Beverly Hills Franchise Agreement as to the provisions for brown and black belt testing.

102. First, the Court notes that the Redondo Beach Franchise Agreement is invalid. Second, the Court notes that the agreements did not explicitly foreclose brown and black belt testing outside of headquarters.

103. There can be no intentional interference with contract when there is no breach or disruption in the contractual relationship.

104. Accordingly, Plaintiff has not shown any intentional interference with contract.

### 5. False designation/unfair competition under the Lanham Act

105. "In order to prevail on a suit under [15 U.S.C. 1125(a)], a plaintiff must prove two basic elements: (1) it has a valid, protectable trademark, and (2) [the defendant's] use

21

of the mark is likely to cause confusion." *S. Cal. Darts Ass'n v. Zaffina*, 762 F.3d 921, 929 (9th Cir. 2014) (citation and internal quotations omitted).

106.   In analyzing likelihood of confusion, "Eight factors are weighed to determine whether confusion is likely: (1) the strength of the mark; (2) the proximity of the goods; (3) the similarity of the marks; (4) evidence of actual confusion; (5) the marketing channels used; (6) the type of goods and the degree of care likely to be exercised by the purchaser; (7) the defendant's intent in selecting the mark; and (8) the likelihood of expansion of the product line." *Zaffina*, 762 F.3d at 930. "No factor is determinative. Rather, it is the totality of facts in a given case that is dispositive." *Id*.

107.   The Court finds that independent belt testing and use of USSD certificates did not exceed the scope of the license given. *See* ¶¶ 70–75. Further, even if the scope of the license was exceeded, the Court finds that this is likely not to have caused confusion.

108.   The Court finds that the use of non-Bushido goods is not likely to cause confusion, especially given that some Bushido goods were not branded with the USSD logo. *See* ¶¶ 66–69.

109.   The Court notes that Plaintiff voluntarily dismissed its trademark dilution claim at trial. The claim is dismissed with prejudice.

110.   Accordingly, Plaintiff has not shown any violation of the Lanham Act.

### 6. Unfair business practices under Cal. Bus. & Prof. Code §§ 17200 et. seq. ("UCL")

111.   As there were no breach of contract or Lanham violations, Plaintiff has not shown any UCL violation.

### 7. Accounting of profits made from Lanham Act violation

112.   As there was no Lanham violation, the Court will not require an accounting.

### 8. Declaratory relief as to rights and obligations under the Redondo Beach and Beverly Hills Franchise Agreements

113. The Court does not exercise its discretion to grant declaratory relief and will not declare rights and obligations under the Redondo Beach and Beverly Hill Franchise Agreements other than to the extent already declared above.

### B. Defendants' Affirmative Defenses

114. As Plaintiff has not prevailed on any claim, the Court does not address Defendants' affirmative defenses.

### C. Defendants' Counterclaims

#### 1. Declaratory relief as to lack of formation of the Redondo Beach Franchise Agreement

115. Declaratory relief requires a showing of: (1) an actual justiciable controversy within the Court's jurisdiction regarding rights or legal remedies; and (2) that Defendants are interested in those rights or legal relations. 28 U.S.C. § 2201.

116. "Since its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co*., 515 U.S. 277, 286 (1995).

117. As discussed above, the Court finds that there is no valid Redondo Beach Franchise Agreement.

#### 2. Declaratory relief as to right to rescind Torrance and Rolling Hills License Agreement

118. In order to prove a CFIL violation, S.B. Ninja must establish that the Torrance and Rolling Hills License Agreement meets all of the elements of a franchise.

119. Pursuant to California Corporations Code § 31005, a "franchise" means a contract or agreement, either expressed or implied between two or more persons where:

    a. A franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor; and

23

b. The operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor or its affiliate; and

c. The franchisee is required to pay, directly or indirectly, a franchise fee.

120. The Court finds that the Torrance and Rolling Hills License Agreement is a *de facto* franchise.

121. It is unlawful "for any person to offer or sell any franchise in [California] unless the offer of the franchise has been registered under this part or exempted under Chapter 1 . . . ." Cal. Corp. Code § 31110.

122. Plaintiff was not registered to sell franchises in 2018, when the franchise at issue was sold.

123. "Any person who offers or sells a franchise in violation of Section 31101, 31110, 31119, 31200, or 31202, or in violation of any provision of this division that provides an exemption from the provisions of Chapter 2 . . . shall be liable to the franchisee or subfranchisor, who may sue for damages caused thereby, and if the violation is willful, the franchisee may also sue for rescission." Cal. Corp. Code § 31300.

124. Plaintiff willfully violated the provision by selling the franchise without registering and willfully including restrictions on the "license agreement" in violation of the law.

125. Accordingly, the *de facto* franchise agreement referred to as the Torrance and Rolling Hills License Agreement is rescinded.

### 3. Breach of contract as to Beverly Hills Franchise Agreement

126. Defendants argue Plaintiff has materially breached the Beverly Hills Franchise Agreement by prohibiting Defendants from participating in company events, receiving training and assistance, and excluding Defendants from company communications.

24

127. The Court finds that there is no breach of the Beverly Hills Franchise Agreement, as Defendants have not shown that Plaintiff has prohibited Defendants from participating in events, ceased training and assistance, or excluded Defendants from company communications other and apart from the reasonable choice to prohibit Murakami and Rinehart *individually* from attending events during active litigation. Other members of LASSD, including students and instructors, were not excluded.

128. Accordingly, Defendants have not shown any breach of the Beverly Hills Franchise Agreement.

### 4. Declaratory relief as to illegality of Redondo Beach License Agreement

129. The Court denies Defendants' request to allow it to amend its counterclaims to include declaratory relief as to the illegality of Redondo Beach License Agreement.

130. The Court notes that under CFIL rescission is timebarred and makes no finding as to whether any alleged violation of the injunction at issue in this case would provide for an alternative pathway to rescind the agreement as illegal. *See* Dkt. 55 at 9.

### 5. Breach of contract as to Torrance and Rolling Hills License Agreements

131. The Court grants Defendants' request to allow it to amend its counterclaims to include breach of contract as to Torrance and Rolling Hills License Agreement according to the proof presented at trial.

132. To establish a breach of contract, the Plaintiff must show: (1) Plaintiff and Defendants entered into a valid, binding contract; (2) Plaintiff performed all obligations under the contract, except those excused; (3) that conditions required by the contract for Defendants' performance had occurred or were excused; (4) that Defendants breached the terms of the contract; (5) Plaintiff was harmed; (6) Defendant's breach of contract was a substantial factor in causing the harm; (7) the parties were capable of contracting; (8) the parties consented to the terms of the contract; (9) the contract has a

lawful purpose; and (10) there was sufficient consideration. Cal. Civ. Code § 1550 *et. seq.*

133. Until formally rescinded by order of this Court, the Torrance and Rolling Hills License Agreement was a valid binding contract. As explained below, Plaintiff has materially breached the contract, but Defendants have not been harmed.

134. The Court finds that Defendants have shown that Plaintiff has prohibited Defendant Murakami, S.B. Ninja, or RHSSD from performing under the agreement.

135. The agreement requires Murakami to administer brown and black belt testing at USSD headquarters. [Ex. 38]. However, Murakami has not been allowed to enter headquarters since September of 2018. The Court finds this is a breach. *See* ¶¶ 23–33.

136. However, these actions have not harmed Defendant Murakami, S.B. Ninja, or RHSSD. At trial, Murakami admitted he has chosen not to send his students to USSD headquarters for testing. [10/30/2019 Trans. Vol. III at 99:6–100:2]. Further, Murakami admitted he still performs tests at his studios away from headquarters. *Id*. Thus, the Court finds that Defendants have not been harmed by any breach.

137. Accordingly, Defendants have not shown any breach of the Torrance and Rolling Hills License Agreements. *See* Cal. Civ. Code § 1550 (requiring damages to prove breach of contract).

### 6. Declaratory relief as to illegality of Beverly Hills Franchise Agreement

138. The Court denies Defendants' request to allow it to amend its counterclaims to include declaratory relief as to illegality of Beverly Hills Franchise Agreement.

139. The Court notes that under CFIL rescission is timebarred and makes no finding as to whether any alleged violation of the injunction at issue in this case would provide for an alternative pathway to rescind the agreement as illegal. *See* Dkt. 55 at 10.

**D. Attorneys' Fees**

140.  § 1717 of the California Civil Code governs attorney fees awards authorized by contract and incurred in litigating claims sounding in contract. "Under that statute, when a contract provides for an award of fees 'incurred to enforce that contract,' 'the party prevailing on the contract … shall be entitled to reasonable attorney's fees." *Douglas E. Barnhart, Inc. v. CMC Fabricators, Inc.*, 211 Cal. App. 4th 230, 237 (2012) (internal citations omitted).

141.  "[W]hen a party litigant prevails in an action on a contract by establishing that the contract is invalid, inapplicable, unenforceable, or nonexistent, section 1717 permits that party's recovery of attorney fees *whenever the opposing parties would have been entitled to attorney fees under the contract had they prevailed*." *Id.* (internal citations omitted).

142.  The Franchise Agreements provide for attorneys' fees in any action to enforce or interpret provisions of the Franchise Agreements under Section 15.11. [Ex. 1 at 28; Ex. 3 at 28]. The Court finds that Defendants are the prevailing party and are entitled to an award of reasonable attorney's fees and costs.

**E. Defendants' Motion for Terminating Sanctions**

143.  On October 30, 2019, Defendants made an oral motion for terminating sanctions. At the request of the Court, on November 11, 2019, Defendants submitted a written Motion for Terminating Sanctions ("Motion"). Dkt. 221. Plaintiff opposed on November 12, 2019 ("Opp'n"). Dkt. 225.

144.  The Court's inherent power to assess sanctions requires a showing that a party "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991) (recognizing inherent power of courts to impose appropriate sanctions where conduct disrupts judicial process). However,

"[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." *Id*. at 44.

145.   "[I]f a court finds 'that fraud has been practiced upon it, or that the very temple of justice has been defiled,' it may assess attorney's fees against the responsible party." *Id*. at 46.

146.   Defendants request "that (1) the Court terminate Plaintiff's case in its entirety by striking its FAC and (2) striking Plaintiff's answer to the Counterclaim and thus treat Plaintiff as if it has defaulted on the [Counterclaim; and] (3) declare Defendants the prevailing party so that Defendants may proceed with an appropriate motion for attorney's fees." Mot. at 2.

147.   Given Mattera's conduct, including lying on the stand, encouraging Auza to lie in his deposition, and continuing to pressure (expressly or impliedly) Rinehart to settle even after Mattera had at some doubts as to whether the "Jessica Allegations" were genuine, the Court finds that Mattera has acted in bad faith. *See* ¶¶ 5–17. Therefore, the Court finds it appropriate to exercise its inherent authority to issue appropriate sanctions in this case.

148.   The Court declines to terminate Plaintiff's case in its entirety. However, independent of the determination that Defendants are the prevailing party on the merits, the Court declares that Defendants are the prevailing party given the bad faith conduct of Mattera in the instant case.

149.   Defendants are awarded all attorneys' fees and costs paid to Defendants' counsel for the entirety of this action subject to a reasonable accounting given to the Court. *See Chambers,* 501 U.S. at 55 (upholding a grant of attorney's fees as a sanction for bad faith conduct for the entire amount of [the opposing party's] attorney's fees).

150.   The fraud on the Court perpetuated by Mattera cannot go unpunished given the many people who have suffered from his actions including Dr. Rinehart, Mr.

Murakami, and the various family members, friends, and loved ones who have been impacted by this litigation.

IV.  **CONCLUSION**

After considering the parties' arguments, for the reasons explained above, the Court **HOLDS** that Plaintiff has not met its burden on any of its claims. The Court also **HOLDS** that Defendants have prevailed on counterclaims one and two as explained above. The Court **GRANTS IN PART** Defendants' Motion for Terminating Sanctions and awards all attorneys' fees and costs to Defendants subject to a reasonable accounting given to the Court. Defendants shall submit a proposed judgment in accordance with this Court's ruling **on or before December 10, 2019.**

DATED:  December 4, 2019

*David O. Carter*
DAVID O. CARTER
UNITED STATES DISTRICT JUDGE